BELL AND OTHERS, PLAINTIFFS IN ERROR *vs.* CUNNINGHAM AND ANOTHER, DEFENDANTS IN ERROR.

C. & Co., merchants of Boston, owners of a ship proceeding on freight from Havana to the consignment of B. & Co. at Leghorn and to return to Havana, instructed B. & Co. to invest the freight, estimated at four thousand six hundred petsos; two thousand two hundred in marble tiles, and the residue, after paying disbursements, in wrapping paper. B. & Co. undertook to execute these orders. Instead however of investing two thousand two hundred petsos in marble, they invested all the funds which came into their hands in wrapping paper, which was received by the captain of the ship, and was carried to Havana, and there sold on account of C. & Co., and produced a loss, instead of the profit which would have resulted had the investment been made in marble tiles. As soon as information of the breach of orders was received, C. & Co. addressed a letter to B. & Co., expressing in strong terms their disapprobation of the departure from their orders, but did not signify their determination to disavow the transaction entirely, and consider the paper as sold on account of B. & Co. Held, that C. & Co. were entitled to recover damages for the breach of their orders; that their not having given notice to B. & Co. that the paper would be considered as sold on their account, did not injure their claim; and that the amount of the damages may be determined by the positive and direct loss arising plainly and immediately from the breach of the orders.

If the principal, after a knowledge that his orders have been violated by his agent, receives merchandize purchased for him contrary to orders, and sells the same without signifying any intention of disavowing the acts of the agent, an inference in favour of the ratification of the acts of the agent may fairly be drawn by the jury. But if the merchandize was received by the principal, under a just confidence that his orders to his agent had been faithfully executed, such an inference would be in a high degree unreasonable. [81]

The faithful execution of orders which an agent or correspondent has contracted to execute, is of vital importance in commercial transactions, and may often affect the injured party far beyond the actual sum misapplied. A failure in this respect may entirely break up a voyage and defeat the whole enterprize. Speculative damages dependent on possible, successive schemes, ought not to be given in such cases; but positive and direct loss, resulting plainly and immediately from the breach of orders, may be taken into the estimate. [85]

The jury, in an action for damages for breach of orders, may compensate the plaintiff for actual loss, and not give vindictive damages. The profits which would have been obtained on the sale of the article directed to be purchased may be properly allowed as damages. [86]

THIS was a writ of error from the circuit court of Massachusetts, prosecuted by the defendant in the circuit court. The bill of exceptions to the opinion of the court below

sets forth the pleadings and evidence, and exhibited the following case.

Cunningham and Loring, merchants of Boston, owners of the brig Halcyon, Skinner master, chartered by them to proceed from Havana to Leghorn with a cargo of sugars, directed Bell, De Yough & Co. merchants at that place and consignees of the brig, to purchase for them, to be shipped to Havana by the Halcyon on her return to that port, a quantity of marble tiles and wrapping paper. The letter containing these instructions was dated 15 September 1824, and stated : " the whole amount of freight received at Leghorn will be about four thousand six hundred petsos : please invest two thousand two hundred in marble tiles; the balance, after paying disbursements, please invest in wrapping paper." " We have further engaged whatever may be necessary to fill the brig on half profits, on account of which seven hundred petsos are to be paid in Leghorn : after purchasing tiles and paying disbursements, you will invest the balance in paper."

A duplicate of this letter was forwarded, to which the following postscript was added.

" P. S. We have further engaged whatever may be necessary to fill the brig, on half profits, on account of which seven hundred petsos are to be paid in Leghorn. After purchasing the tiles and paying disbursements, you will invest the balance in paper, as before mentioned. In previous orders the reams have been deficient in the proper number of sheets. We will thank you to pay particular attention to this, as well as having all the sheets entire."

" This letter was received by the plaintiffs in error on the 13th of November 1824, and on the 9th of the December following they addressed a letter to Cunningham and Loring, in which they stated,

" The order you are pleased to give us for paper and marble tiles, to be paid for out of the freight of the Halcyon from Havana, to our consignment, has our particular attention.

" You have done very right to send on this order, as the wrapping paper cannot be got in readiness before the end

[Bell et al. *vs.* Cunningham.]

of January, and therefore had it been delayed longer, could not have been in time for your brig Halcyon.

" We have contracted for *five thousand* reams, at as near your limits as possible, the article being just now in great demand. The tiles shall be collected also."

On the 14th of January 1825 they wrote to Cunningham and Loring :

"The wrapping paper ordered by yours of the 15th of September, will be in readiness by the end of this month, and we shall have by that time, ready to ship, ten thousand marble tiles of twelve ounces, seven thousand six hundred of fourteen ounces, and six thousand two hundred of sixteen ounces, which will be about the investment you desire of the freight from the Halcyon."

On the 21st of January 1825, the plaintiffs in error informed the defendants of the arrival of the Halcyon, and on the 21st of February they addressed them another letter, stating, " The sample of wrapping paper sent us by Messrs Murdoch, Storcy & Co. we found much inferior to any made in this state, and have executed your order with a much better article, although the difference in price bears no proportion. As your account current after purchasing the paper, which captain Skinner told us was the better article for investment, gave only a small balance, we increased a little one quantity of paper, and sent no tiles.

"We now hand you bill of lading and invoice, amounting to *P*2801 18 for 473 packages of wrapping paper, shipped for your account and risk, on board your brig Halcyon, John Skinner master, which if found right, please to pass accordingly.

" Captain Skinner has been made aware of the superior quality of this parcel of paper, and that each ream is composed correctly of twenty quires of twenty-four and not sixteen sheets, as has been occasionally shipped ; so that he will no doubt make an adequate price for it, because in reality the prices at which it is invoiced, are reduced, by this difference, below those mentioned in your order."

The account current stated the investment of petsos 2801 18 in wrapping paper, and showed that the balance

[Bell et al. *vs*. Cunningham.]

of the freight and other assets in the hands of the plaintiffs in error, belonging to Cunningham and Loring, had been absorbed in the disbursements of the brig, &c.

The Halcyon proceeded to Havana, and there the paper shipped by the plaintiffs in error was sold, and the proceeds accounted for to Cunningham and Loring by their agents at that port. Had the marble tiles been shipped as ordered, there would have been a considerable profit in the transactions, instead of the heavy loss sustained on the sales of the paper.

Cunningham and Loring, on being advised of the noncompliance, by the plaintiffs in error, with their instructions of the 15th of September 1824, addressed the following letter to them:

*Boston, April* 18*th,* 1825.

MESSRS BELL, DE YOUGH, & Co.

Gentlemen: We have received your favour of February 21st. The following are extracts of our letter to you of 13th September, directing the investment of the freight per Halcyon. "The whole amount of freight received at Leghorn will be about 4600 petsos: please invest 2200 in marble tiles; the balance, after paying disbursements, please invest in wrapping paper. We have further engaged whatever may be necessary to fill the brig, on half profits, on account of which 700 petsos are to be paid in Leghorn: after purchasing the tiles and paying disbursements, you will invest the balance in paper."

We are exceedingly disappointed that such positive directions were not complied with: they were given for sufficient reasons, and without authority to alter them. You omitted to invest the 700 petsos on account of the freight of 150 boxes marked T, which we regret, as we wished the funds at Havana; with this you would have had 4240 petsos, which would have furnished the tiles, paid disbursements, and left 1393 petsos to be invested in paper.

Very respectfully,

CUNNINGHAM AND LORING.

[Bell et al. *vs.* Cunningham.]

One of the partners of the firm being in Boston in 1827, an action was instituted against the plaintiffs in error, in the court of common pleas of the county of Suffolk, for damages for the loss sustained by the plaintiffs; by the conduct of the defendants; and on their petition, the defendants in the suit being aliens, was removed to the circuit court of the United States for the district of Massachusetts.

On the trial of this cause in the circuit court, it was in evidence that the tiles ordered by the plaintiffs in the suit, could have been procured by the defendants, and at prices which would have produced a profit to the plaintiffs.

During the trial, exceptions were taken to the opinion of the court, by the defendants in the circuit court, which exceptions are stated in the opinion of this court, and a verdict and judgment having been rendered for the plaintiffs, the defendants prosecuted this writ of error.

The case was argued by Mr Ogden for the plaintiffs in error, and by Mr Webster for the defendants.

For the plaintiffs it was contended, that the circuit court had erred in leaving to the jury the construction of the correspondence between the plaintiffs in the court below and the defendants, of the 15th September 1824. The evidence being written, the construction of it was exclusively with the court. The course adopted by the defendants was in full accordance with the objects of the latter, as the paper could not be procured without previous orders, and they having been given, and the defendants bound to take the paper so ordered, they were necessarily without the funds required to purchase the tiles.

The plaintiffs below were bound to give the defendants notice of their intention to claim damages from them for non-compliance with instructions, and their neglect to do this, as well as their having received the proceeds of the paper, was a waiver of all their claims. The letter of the 18th April 1825 was not such a notice.

The rule adopted in the assessment of the damages was incorrect. The plaintiffs below were entitled to no more than the difference between the cost of the paper which had

been shipped at Leghorn, and the price of tiles at that place. Cited, 1 Vez. Jun. 509.

Mr Webster, for the defendants in error, said that there were no questions of law in the case which presented any difficulty, and the facts clearly established a claim by the defendants on the plaintiffs in error for a manifest breach of instructions, and upon these facts the jury had given their verdict. As to the rule adopted by the jury for the assessment of the damages, they had exercised their sound discretion without any instructions from the court which interfered with this their peculiar province.

As to the notice of claim, by the defendants in error, of the 18th of April 1825, it was sufficient. They might have rejected the articles altogether, or have received the proceeds arising from their sale in the regular course of trade, and claimed, as they have in this case, damages for the loss.

Notice of claim is not necessary. If the party does not intend to refuse the article altogether, it is not required; and the neglect to do so is no bar to a claim for damages.

In this case the letter of the defendants is an express disavowal of the acts of their agents. Cited, Lorain *vs.* Cartwright, 3 Wash. C. C. R. 151.

Mr Chief Justice MARSHALL delivered the opinion of the Court.

This is a writ of error to a judgment rendered in the court of the United States, for the first circuit and district of Massachusetts, in a suit brought by Cunningham & Co. against Bell, De Yough & Co., on a special contract.

Cunningham & Co., merchants of Boston, had let their vessel, the Halcyon, to Messrs Atkinson and Rollins, of the same place, to carry a cargo of sugars from the Havana to Leghorn. The cargo was consigned to Messrs Bell, De Yough & Co., merchants of Leghorn; and Cunningham & Co. addressed a letter to the same house, instructing them to invest the freight, which was estimated at four thousand six hundred petsos, two thousand two hundred in marble tiles, and the residue after paying disbursements in wrapping

paper. Messrs Bell, De Yough & Co. undertook to execute these orders. Instead however of investing the sum of two thousand two hundred petsos in marble tiles, they invested the whole amount of freight which came to their hands, amounting to three thousand four hundred and forty-nine petsos, and seven-thirds, instead of four thousand six hundred, in wrapping paper, which was received by the captain of the Halcyon, shipped to the Havana, and sold on account of Messrs Cunningham & Co.. One of the partners of Messrs Bell, De Yough & Co. having visited Boston on business, this suit was instituted against the company. At the trial, all the correspondence between the parties was exhibited, from which it appeared that Cunningham & Co. as soon as information was received that their orders had been broken, addressed a letter to Messrs Bell, De Yough & Co., expressing in strong terms their disapprobation of this departure from orders, but did not signify their determination to disavow the transaction entirely, and consider the wrapping paper as sold on account of the house in Leghorn.

In addition to the correspondence, several depositions were read to the jury, which proved that the orders respecting the marble tiles might have been executed without difficulty, but that the house in Leghorn, expecting to receive more money on account of freight than actually came to their hands, had contracted for so much wrapping paper as to leave so inconsiderable a sum for the tiles, that they determined to invest that small sum also in wrapping paper.

At the trial, the counsel for the defendants in the court below, prayed the court to instruct the jury on several points which arose in the cause. Exceptions were taken to the rejection of these prayers, and also to instructions which were actually given by the court, and the cause is now heard on these exceptions.

The defendants' counsel prayed the court to instruct the jury, that the letter of the 9th of December 1824, from the defendants to the plaintiffs, was notice to them of the exercise of the aforesaid authority in contracting for five thousand reams of paper, to be paid for out of the freight money of the Halcyon, and was admitted by the plaintiffs in their

letter of the 7th of March 1825, to be a rightful exercise of such authority; and that the freight money of the Halcyon was pledged for payment of the said quantity of paper.

But the court so refused to instruct the jury, because it did not appear, on the face of the said letter, at what price the said wrapping paper was purchased, so as to put the plaintiffs in possession of the whole facts, that there had been a purchase of paper to an extent, and at a price which would amount to a deviation from the orders of the plaintiffs, or that defendants had deviated from such orders, without which there could arise no presumption of notice of any deviation from such orders, or of any ratification of any such deviation from such orders. But the court did instruct the jury, that if, from the whole evidence in the case, the jury were satisfied that the letter of the 9th of December, connected with the letter of the 14th of January, did sufficiently put the plaintiffs in possession of all the facts relative to such purchase, and the price thereof, and of such deviation, and that the letter of the 7th of March, in answer thereto, was written with a full knowledge and notice of all the facts, and that the plaintiffs did thereupon express their approbation of all the proceedings and acts of the defendants relative to such purchase, then, in point of law, it amounted to a ratification thereof, even though there had been a deviation from the orders in this behalf.

This first exception is very clearly not supported by the fact, and was very properly overruled for the reasons assigned by the judge. The plaintiffs in that court, when the letter of the 7th of March 1825 was written, had no reason to presume that their orders had been violated, and consequently could not be intended to mean by that letter to sanction such violation.

The said defendants' counsel further prayed the court to instruct the jury, that, if they believed, from the evidence submitted to them, that the required quantity of tiles could be had in season for the return cargo of the Halcyon, without any previous contract therefor, and that the five thousand reams of paper could not be had in season for said vessel, without a previous contract therefor, that, inasmuch as the

plaintiffs admit, *in their declaration,* that they did not fur-
nish the defendants with freight money enough to purchase
twenty-two hundred petsos worth of tiles, and pay the dis-
bursements, and pay for the said five thousand reams of
wrapping paper, but only with three thousand four hundred
and forty-nine petsos, 7.3, (as in their declaration is express-
ed), and which latter sum was only sufficient for the pay-
ment of said disbursements, and for the performance of the
defendants' own contract in paying for said wrapping paper,
the defendants were not holden to purchase any tiles, but
were holden to ship the said five thousand reams of paper on
board the Halcyon, as the property of the plaintiffs.

But the court refused so to instruct the jury; and the court
did instruct the jury, that if the defendants undertook to
comply with the original written orders of the plaintiffs,
and no deviation therefrom was authorised by the plaintiffs,
the defendants were bound, if funds to the amount came
into their hands, in the first instance to apply two thousand
two hundred petsos of the funds which should come into
their hands and be applied to this purpose, to the purchase
of tiles, and in the next place, to deduct and apply as much
as was necessary to pay the disbursements, and then to
apply the residue to the purchase of paper : that if it were
necessary or proper under the circumstances to make a pur-
chase of the paper, before the arrival of the vessel, the
defendants were authorised to act upon the presumption
that four thousand six hundred petsos would come into their
hands, and therefore the plaintiffs would have been bound
by any purchase of paper made by the defendants, to the
amount of the balance remaining of the said four thousand
six hundred petsos, after deducting the two thousand two
hundred petsos for tiles, and the probable amount of such
disbursements. But that it was the duty of the defendants,
if they had funds, to deduct in the first instance, from the
whole amount, two thousand two hundred petsos for tiles;
and if they did not, but chose to purchase paper without
any reference thereto, it was a deviation from the plaintiffs'
orders, and unless ratified by the plaintiffs, the defendants

were answerable therefor : that if the defendants had pur-
chased paper, before the arrival of the vessel, to the amount
only of such residue or balance as aforesaid, and the funds
had afterwards fallen short of the expected amount of four
thousand six hundred petsos, the defendants were not bound
to apply any more than the sum remaining in their hands,
after deducting the amount of such purchase of paper, and
such disbursements, to the purchase of tiles : and that after
the receipt of the letters of the 20th of September, and the
duplicate of the 15th of September, if the defendants under-
took to perform the orders therein contained, there was an
implied obligation on them to apply the seven hundred pet-
sos mentioned therein for the plaintiffs' benefit, to the pur-
poses therein stated : that, to illustrate the case, if the jury
were satisfied that the whole funds which came into the
hands of the defendants for the plaintiffs (independent of
the seven hundred petsos) were three thousand four hun-
dred and fifty petsos, then the said seven hundred petsos
should be added thereto, as funds in the defendants' hands,
making in the whole four thousand one hundred and fifty
petsos.

In the view of the facts thus assumed by the court, and to
illustrate its opinion, the practical result under such circum-
stances would be thus : the defendants were authorised to
act on the presumption of funds to the amount of four thou-
sand six hundred petsos. Deduct two thousand two hundred
petsos for tiles and six hundred and fifty for probable dis-
bursements, the balance left to be invested in paper would
be one thousand seven hundred and fifty. The defendants
would then be authorised, if the circumstances of the case
required it, to contract for, or purchase, to the amount of
one thousand seven hundred and fifty petsos in paper, before
the arrival of the vessel : and if the funds should after-
wards fall short of the expected amount of four thousand
six hundred petsos, the sum of one thousand seven hundred
and fifty petsos, and the disbursements, say six hundred and
fifty petsos, were to be first deducted out of the funds re-
ceived, and the balance only invested in tiles. That if the

funds which actually came to the defendants' hands (without the seven hundred petsos), and the sum of seven hundred petsos were also received, the whole amount would be four thousand one hundred and fifty petsos; then the defendants would be justified in deducting therefrom, for the purchase of paper, one thousand seven hundred and fifty petsos, and disbursements six hundred and fifty petsos; leaving the sum of one thousand seven hundred and fifty petsos to be invested in tiles: and to this extent, if there was ratification, the defendants would be bound to invest for the plaintiffs in tiles, and were guilty of a breach of orders if they did not so invest, and the plaintiffs entitled to damages accordingly. But the court left the whole facts for the consideration of the jury, and stated the preceding sums only as illustrations of the principles of decisions, if they were found conformable to the facts.

This prayer was properly overruled for the reasons assigned by the court. The orders were peremptory to apply two thousand two hundred petsos in the first instance to the purchase of tiles. The residue only of the funds which came to the hands of Bell, De Yough and Co. was applied to the purchase of wrapping paper; and the instruction that Bell, De Yough and Co. were justifiable in acting on the presumption that the whole sum mentioned in the letter of Cunningham and Co. would be received; and in contracting by anticipation for wrapping paper on that presumption, was as favourable to Bell, De Yough and Co. as the law and evidence would warrant. The only questionable part of the instruction is that which relates to the seven hundred petsos, mentioned in the postscript of that copy of the letter of the 15th of September 1824 which went by the Halcyon. That postscript is in these words: " P. S. We have further engaged whatever may be necessary to fill the brig on half profits, on account of which seven hundred petsos are to be paid in Leghorn. After purchasing the tiles and paying the disbursements, you will invest the balance in paper as before mentioned. In previous orders the reams have been deficient in the proper number of sheets. We will thank you

to pay particular attention to this, as well as having all the sheets entire."

The court instructed the jury that if the defendants undertook to perform the orders, there was an implied obligation on them to apply the seven hundred petsos mentioned therein to the purposes therein mentioned.

No doubt can be entertained of the existence of this implied obligation if the seven hundred petsos were in fact received. This fact however could not be decided by the court, and was proper for the consideration of the jury. If the court took it from them, the instruction would be erroneous. Some doubt was at first entertained on this part of the case; but on a more attentive consideration of the charge that doubt is removed. The declaration that there was an implied obligation to apply the seven hundred petsos as directed in the letter and postscript, is not made in answer to any prayer for an instruction respecting the reception of this money, but respecting its application. The answer therefore which relates solely to the application ought not to be construed as deciding that it was received. The judge afterwards, by way of illustration, shows the sum which might have been invested in wrapping paper consistently with the orders given by Cunningham and Co. on the hypothesis that the freight money would amount to four thousand six hundred petsos, and also on the hypothesis that the additional seven hundred petsos were received; and adds: "But the court left the whole facts for the consideration of the jury, and stated the preceding sums only as illustrations of the principles of decisions, if they were found conformable to the facts." We think then that the question, whether the seven hundred petsos were actually received by Bell, De Yough and Co. was submitted to the jury on the evidence, and that there is no error in this instruction.

The defendants' counsel did further pray the court to instruct the jury that inasmuch as the plaintiffs admit, in their declaration, that the freight money received by the defendants was three thousand four hundred and forty-nine petsos 7.3; and it appearing that the whole of that sum had been ab-

sorbed in the purchase of five thousand reams of wrapping paper, disbursements, and reasonable and customary charges; and that as the said plaintiffs did accept and sell the said five thousand reams of paper on their own account at the Havana; that such receipt and sale of the paper on their account, is, *in law*, a ratification of the acts of the defendants at Leghorn, in the application of the whole of said freight money.

But the court refused so to direct the jury, because the instruction prayed for assumed the decision of matters of facts, and because the plaintiffs did not admit that the sut. of three thousand four hundred and forty nine petsos 7.3 was the whole sum or funds received as freight money by the defendants, but contended that the additional sum of seven hundred petsos was so received, and ought to be added thereto; and because, whether the receipt and sale of the paper at Havana was a ratification of the acts of the defendants at Leghorn or not, was matter of fact for the consideration of the jury, under all the circumstances of the case, and not matter of law to be decided by the court in the manner prayed for.

We think this instruction was properly refused by the court for the reasons assigned by the judge. It may be added in support of the statement made by the court, that though the first and second new count in the declaration claim only the sum mentioned by counsel in their prayer, the third claims a larger sum, and consequently left the plaintiffs in the court below at liberty to ask from the jury such sum within the amount demanded by the third count as the evidence would in their opinion prove to have come to the hands of the defendants. The question whether the receipt and sale of the sugars at the Havana amounted to a ratification of the acts of Bell, De Yough and Co. at Leghorn, certainly depended on the circumstances attending that transaction. If Cunningham and Co., with full knowledge of all the facts, acted as owners of the wrapping paper without signifying any intention of disavowing the acts of their agents, an inference in favour of ratification might be fairly

Vol. III.—L

drawn by the jury. If the cargo from Leghorn was received and sold in the Havana under directions given at a time when Cunningham and Co. felt a just confidence that their orders would be faithfully executed by Bell, De Yough and Co. such an inference would be in a high degree unreasonable. This subject was therefore very properly left to the jury.

And the defendants' counsel furthermore prayed the court to instruct the jury, as the plaintiffs' *first new count*, filed at this term, by leave of court, that, inasmuch as the plaintiffs have set forth the letter of the plaintiffs to the defendants of the 15th of September 1824, as containing the special contract between the plaintiffs and defendants; and as the postscript to that letter contains a material part of the contract; and as the said postscript is not set forth in said count as part of said letter, but as *wholly* omitted; that the evidence offered by the plaintiffs, in this behalf, does not support and prove the contract as in that count is alleged.

But the court refused so to instruct the jury, being of opinion that the said postscript did not necessarily as a matter of law establish any variance between the first new count and the evidence in the case; and the court left it to the jury to consider upon the whole evidence in the case, whether that count was established in proof, and if in their opinion there was a variance, then to find their verdict for the defendants on that count.

On the 15th of September 1824, Cunningham and Co. addressed a letter to Bell, De Yough and Co. containing the orders which have given rise to this controversy. This letter was sent by the Halcyon, and contained the postscript mentioned in this prayer for instructions to the jury. It was received on the 20th of January 1825.

As the Halcyon was to make a circuitous voyage by the Havana, and Cunningham and Co. were desirous of communicating the contents of their letter by that vessel previous to her arrival, a duplicate was sent by the Envoy, which sailed a few days afterwards direct for Leghorn.

In this letter the postscript was omitted. It was received

[Bell et al. *vs.* Cunningham.]

on the 30th of November 1824, and was answered soon afterwards with an assurance that the orders respecting the tiles and wrapping paper would be executed.

The first new count in the declaration is on the special contract, and sets out at large the letter sent by the Envoy, which was first received, and to which the answer applied; in which Bell, De Yough and Co. undertook to execute the orders that were contained in that letter. It is undoubtedly true that a declaration which proposes to state a special contract in its words, must set it out truly; but this contract was completed by the answer to the letter first received, and the obligation to apply the funds when received was then created. The plaintiffs below might certainly count upon this letter as their contract. Other counts in the declaration are general, and both letters may be given in evidence on them. The defendants might have objected to the reading of the letter by the Halcyon on the first new count; but the whole testimony was laid before the jury without exception, and the counsel prayed the court to instruct the jury that as the postscript was omitted in the letter stated in the first count, the evidence did not support the contract as in that count alleged.

This prayer might perhaps have been correctly made, had no other letter been given in evidence than that received by the Halcyon. But as the very letter on which the count is framed, and which was the foundation of the contract was given in evidence, the court could not have said with propriety that this count was not sustained. It was left to the jury to say whether there was a variance between the evidence and this count, and if in their opinion such variance did exist, they were at liberty to find for the defendants on that count. If there was any error in this instruction, it was not to the prejudice of the plaintiffs in error.

The fifth, sixth and seventh exceptions appear to have been abandoned by the counsel in argument, and were certainly very properly abandoned. These several prayers are founded on the assumption of contested facts, which were submitted and ought to have been submitted to the jury.

The eighth and last prayer is in these words: "The de-

[Bell et al. *vs.* Cunningham.]

fendants' counsel prayed the court to instruct the jury, that if they should find that any contract or promise was made by the defendants as to the purchase and shipment of twenty-two hundred petsos worth of tiles, and not performed, (but broken), that the measure of damages was the value of the said sum of twenty-two hundred petsos *at Leghorn* and not at Havana : and that as the plaintiffs have taken and accepted another article of merchandise at Leghorn, viz. five thousand reams of wrapping paper, of greater value than two thousand two hundred petsos, and which was purchased with the same moneys which plaintiffs aver should have been invested in marble tiles as aforesaid, the plaintiffs are not entitled to recover any damages in this action.

But the court refused so to instruct the jury, because the instruction prayed for called upon the court to decide on matters of fact in controversy before the jury. And the court did instruct the jury, that if upon the whole evidence they were satisfied that the orders of the plaintiffs had been broken by the defendants in not purchasing the tiles in the manner stated in the declaration, and that there had been no subsequent ratification by the plaintiffs of the acts and proceedings of the defendants ; then that the plaintiffs were entitled to recover their damages for the breach thereof; that what the proper damages were, must be decided by them upon the whole circumstances of the case ; that in their assessment of damages they were not bound to confine themselves to the state of things at Leghorn, and they were not precluded from taking into consideration the voyage to the Havana, and the fact of the arrival of the vessel there, the state of the markets, and the profits which might have been made by the plaintiffs, if their orders as to the tiles had been complied with ; that the court would not lay down any rule for their government, except that they were at liberty to compensate the plaintiffs for their actual losses sustained, as a consequence from the default of the defendants, but they were not at liberty to give vindictive damages.

This prayer consists of two parts. 1st. The measure of damages if the jury should be of opinion that the contract was broken. 2. The ratification of the acts of Bell, De

Yough, and Co, by accepting at Havana another article in lieu of the tiles.

1. The measure of damages. The plaintiffs in error contend, that the value of the money at Leghorn, which ought to have been invested in tiles, and not its value at the Havana, ought to be.the standard by which damages should be measured. That is, if his views are well understood, that the value of two thousand two hundred petsos at Leghorn, with interest thereon, and not the value of the tiles in which they ought to have been invested at the Havana, ought to be given by the jury.

This instruction ought not to have been given unless it be true, that special damages for the breach of a contract can be awarded under no circumstances whatever; that an action for the breach of contract was equivalent, and only equivalent, to an action for money had and received for the plaintiffs' use. That the breach of contract consisted in the non-payment of two thousand two hundred petsos; not in the failure to invest that sum in tiles. In fact, that under all circumstances, if no money came to the hands of the defendants, the damages in such an action must be nominal. This can never be admitted.

The faithful execution of orders which an agent or correspondent has contracted to execute, is of vital importance in commercial transactions, and may often affect the injured party far beyond the actual sum misapplied. A failure in this respect may entirely break up a voyage, and defeat the whole enterprise. We do not mean that speculative damages, dependent on possible successive schemes, ought ever to be given; but positive and direct loss, resulting plainly and immediately from the breach of orders, may be taken into the estimate. Thus in this case—an estimate of possible profit to be derived from investments at the Havana, of the money arising from the sale of the tiles, taking into view a distinct operation, would have been to transcend the proper limits which a jury ought to respect; but the actual value of the tiles themselves, at the Havana, affords a reasonable standard for the estimate of damages. The instructions of the judge seem to contemplate this course, and his restraining

[Bell et al. *vs.* Cunningham.]

power would have corrected, by granting a new trial, any great excess in this particular. The rule that the jury was to compensate the plaintiffs for *actual* loss, and not to give vindictive damages, is thought by this court to have been correct. The declaration expressly claims the loss of the profits which would have accrued from the sale of the tiles.

That part of this prayer which relates to the ratification of the acts of Bell, De Yough, and Co. by the receipt of the wrapping paper at the Havana, has been fully noticed in the observations on the third exception.

This court is of opinion that there is no error in several instructions given by the circuit court to the jury, and that the judgment ought to be affirmed with costs and six per cent damages.

This cause came on to be heard on the transcript of the record from the circuit court of the United States for the district of Massachusetts, and was argued by counsel; on consideration whereof, it is ordered and adjudged by this court, that the judgment of the said circuit court in this cause be, and the same is hereby affirmed, with costs and damages, at the rate of six per centum per annum.